UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ALPHONSO SIMMONS,

                    Plaintiff,            07 Civ. 7383 (DAB)(DFE)
                                          (This is not an ECF case)
    -against-                             REPORT AND RECOMMENDATION
                                          TO JUDGE BATTS

FRANK ROBINSON, Grievance Supervisor,
Sing Sing Correctional Facility;
A[NTHONY] CHU, Food Service Administrator,
Sing Sing Correctional Facility;_____
K[ENNETH] DECKER, Acting Superintendent,
Sing Sing Correctional Facility;
JOHN NUTTAL, Deputy Commissioner of
Program Services, New York State
Department of Correctional Services;
BRIAN FISCHER, Commissioner of the
New York State Department of
Correctional Services;

_____Defendants.
------------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

     The *pro se* plaintiff Alphonso Simmons is a prisoner in the
New York State prison system.  He was at Sing Sing Correctional
Facility for slightly over six months, from October 31, 2006 to
May 8, 2007.  Then he was at Attica Correctional Facility from
May 2007 to February 2009.  Since February 10, 2009, he has been
at Green Haven Correctional Facility.

     He commenced this action pursuant to 42 U.S.C. § 1983 with a
Complaint signed on July 23, 2007.  The Complaint names five
defendants; the first three defendants were officials at Sing
Sing, and the other two defendants are the Commissioner and a
Deputy Commissioner of the State Department of Correctional
Services ("DOCS").  Simmons alleges that the defendants violated
his right to practice the Muslim religion by inadequately
protecting him from pork contamination, and by failing to
properly investigate a grievance that he filed in December 2006
at Sing Sing.

     On October 31, 2008, the defendants moved for summary
judgment.  (Docket Item ("Doc") #19, supported by a 26-page
Memorandum of Law (Doc #20) and other documents (Docs ##21-29).)

-1-

By Order of Reference dated February 6, 2009, Judge Batts referred the motion to me for a Report and Recommendation.

On March 11, 2009, plaintiff mailed his voluminous opposition papers. (Docs ##38-53, including a 50-page Memorandum of Law (Doc #43).)

On May 8, 2009, the defendants mailed two reply documents: Doc #55 (a declaration annexing Sing Sing's Heat Logs, which seems redundant since they were already in the moving papers as Exh. A to Doc #24) and Doc #56 (an 11-page Reply Memorandum of Law).

On July 31, 2009, Judge Buchwald issued an opinion granting summary judgment and dismissing very similar claims brought by Muslim prisoners at Green Haven. *Majid v. Fischer*, 07 Civ. 4585 (NRB), 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. July 31, 2009). Defense counsel promptly supplied copies of Judge Buchwald's opinion to me and to plaintiff, by letter mailed on August 7, 2009 (although misdated as April 22, 2009). Judge Buchwald was focusing on Green Haven, but she ruled on the basis of a record essentially identical to the record in the case at bar, including the declaration of Elizabeth Culkin (described below at Section 2) and the reports of Imam Feisal Abdul Rauf (described below at Section 4).

For the reasons discussed below, I recommend that Judge Batts grant the defendants' motion for summary judgment.

1. <u>The focus of this lawsuit is Sing Sing.</u>

I begin by noting that the Prison Litigation Reform Act says: "No action shall be brought with respect to prison conditions under [42 U.S.C. §1983], or any other Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Prior to filing this lawsuit, Simmons made only one relevant grievance, and it was quite limited in scope. Dated December 13, 2006, it said:

> I would like to file a grievance because pork was served in the [Sing Sing] messhall on the above date. As a Muslim I am forbidden to eat pork products. An alternate is served, however the manner in which they serve the food subjects the other items on the menu to cross contamination. That is the pork gets into the rice, vegetables and is splashed on the bread tray.

Also pork items are served on the same plates
and the population uses the same utensils to eat
with.  Even though these items are washed, they
are washed in the same machine, subjecting them
to cross contamination.
As a solution, I suggest:
1) use disposable forks and plates when
pork is served; and
2) set up one side of the messhall for pork
and the other side for non-pork to preserve the
integrity of the items served.

(Complaint, Exh. B.)

Simmons's grievance was investigated by defendant Anthony
Chu, a Food Service Administrator responsible for the daily
operation and administration of Sing Sing's messhall.  Chu's
10/29/08 Declaration (Doc #24) annexes (as Exh. A) Sing Sing's
Heat Logs, consisting of 61 pages dated from November 13, 2006
through January 13, 2007, showing that the dishwashing apparatus
met or exceeded 170 degrees Fahrenheit, and also annexes (as Exh.
C) Chu's 1/8/07 memo to the Inmate Grievance Committee, in which
Chu reported:  "Pork is served according to state guidelines.  An
alternative is provided.  Separate utensils are used; also,
separate wells in the steam table are used.  All dishware in the
messhall is washed and sanitized at proper temperature per state
directive."

On January 16, 2007, Sing Sing's Inmate Grievance Committee
adopted Chu's report, but added that "messhall worker[s] are
advised to be mindful of cross contamination while serving pork
items to population."  (Doc #29, Exh. B.)  Chu states that he
promptly met with messhall staff and reviewed DOCS' procedure
regarding the proper service of pork.  (Doc #24 at ¶12.)
Simmons's grievance was then denied by Sing Sing's First Deputy
Superintendent (Doc #23) and by the Central Office Review
Committee of DOCS in Albany (Doc #29, Exh. C).

Simmons then came to our Court.  His Complaint added a new
claim, namely that the defendants discriminated against him by
not providing him with self-contained meal packages and utensils
similar to those provided to Jewish inmates.  (Complaint at ¶¶21-
22.)  This new claim arguably went beyond the scope of his
grievance and his appeal (which are annexed to his Complaint).
But the defendants have chosen to concede that this claim
"closely followed those issues plaintiff raised in his
grievance."  (Doc #56, Reply Mem. at p. 4.)  On the other hand,
the defendants have objected to his attempts to go beyond the

grievance and to make allegations about Attica and Green Haven and the Food Production Center in Rome, NY. (Doc #56 at pp. 2-6.) I agree with that objection. The focus of this lawsuit is Sing Sing, which was the focus of the grievance.

> 2. Doc #22: The 10/29/08 Declaration of Elizabeth Culkin, Assistant Director of the Office of Nutritional Services of DOCS

Ms. Culkin's Declaration includes the following:

The Office of Nutritional Services is responsible for providing nutritionally adequate meals for DOCS' approximately 61,000 inmates. "Nutritional Services establishes a standardized state-wide menu which is used at all DOCS facilities." (Doc #22, ¶4.)

In August 1996, DOCS initiated its Religious Alternative Menu ("RAM") program; by November 1996, the program was available to inmates at almost all DOCS facilities. "The RAM program was designed to accommodate the needs of inmates who have different dietary requirements due to their religious beliefs or personal dietary needs. As such, the RAM is available to any inmate who wants it regardless of religious affiliation." (*Id.*, ¶5.)

"The RAM program ... provides an alternative to the regular lunch and dinner entrees." (*Id.,* ¶6.) "To accommodate Muslim inmates whose religious beliefs prevent the consumption of pork, DOCS serves a pork entree only once a month at its facilities. Except for the one pork entree per month, all other food products are pork free." (*Id.,* ¶7.)

"The Cold Alternative Diet ("CAD") is DOCS' kosher diet available to Jewish inmates so they may comply with their religious practice. For the most part, the items provided in the CAD are prepackaged and as a result the meals are more expensive than the meals served to the general population. Moreover, kosher meals require separate utensils, dishes, and cooking implements for dairy and meat dishes and all kosher food must be kept separate from all non-kosher food." (*Id.,* ¶8.)

"On information and belief, Muslim inmates are able to eat food in the [RAM] in accordance with religious practice, while observant Jewish inmates may not eat the RAM and maintain religious practice. Because the CAD is more expensive per meal than the regular menu and the RAM, DOCS limits participation in the CAD to Jewish inmates, because their religion requires it. The CAD menu costs DOCS approximately $5.42 per inmate per day,

whereas a regular menu costs approximately $2.61 per inmate per day.  The RAM menu costs approximately $2.60 per inmate per day."
(*Id.,* ¶10 inc. n.1.)

### 3.  Doc #24: The 10/29/08 Declaration of Anthony Chu, Food Service Administrator II at Sing Sing

The procedural background leading up to this Declaration is as follows.

In April 2008, Simmons was transported from Attica to Sing Sing and back so that defense counsel could take his deposition. On April 24, 2008, at Sing Sing, he gave his testimony; excerpts of the transcript are at Doc #25, Exh. A.  His testimony included the following, at Tr. 141:

> Q.  In Sing Sing, how are the utensils cleaned?
> A.  I don't know.  I never worked in the mess hall at Sing Sing so I don't know how they clean in Sing Sing.

With a postmark of August 28, 2008, Simmons served a Second Set of interrogatories and document requests.  Document Request No. 1 said:  "Please provide temperature logs for Sing Sing Correctional Facility messhall for the 30 days prior to December 13, 2006 and the thirty days after."  On October 14, 2008, defense counsel served its Response (Doc #49) and supplied Simmons with 61 pages of temperature logs (stamped CHU-1 through CHU-61) for each of the 61 days from 11/13/06 through 1/13/07.

On October 31, 2008, defense counsel mailed Simmons the motion for summary judgment, including defendant Chu's 10/29/08 Declaration (Doc #24), which (a) gave a detailed explanation of "how they clean in Sing Sing," and (b) annexed as Exh. A an extra copy of the 61 pages of temperature logs.

Mr. Chu's Declaration includes the following:

"The Sing Sing mess hall serves approximately 1,600 inmates per day.  The mess hall employs 8 civilian and 220 inmate food service personnel.  There are many Muslim inmate service personnel who work at the mess hall.  A Muslim chaplain regularly visits the mess hall to discuss the service of food to Muslim inmates, especially during the Muslim holy days."  (Doc #24, ¶4.)

At Sing Sing, pork is served once a month.  "Pork entrees are shipped from DOCS' Food Production Center and arrive at Sing Sing in sealed, plastic packages.  The pork entree is stored in

one of Sing Sing's coolers until it is prepared and served. Pork entrees are cooked in vats of boiling water while they are still in their plastic packaging. Once a pork entree is thoroughly heated, it is placed into pans and transported to one of the five serving lines in the mess hall." (*Id.*, ¶5.)

"To prevent contamination, the pork entree is separated from the Religious Alternative Meal ('RAM') and served at the end of the line, as far away as practicable from RAM meals. To further prevent contamination, food service staff place a barrier, usually a plastic serving tray, between the pork entree and the other pans to further prevent cross contamination with other foods. When a pork entree is served, it is conspicuously marked and usually served by a single food service staff member." (*Id.*, ¶6.)

"All meals are served using separate serving utensils, trays, and pans. Pots, pans, and utensils used to serve non-RAM meals, including pork, are thoroughly sanitized before being used again." (*Id.*, ¶7.)

"All serving equipment and eating utensils are cleansed and sanitized using either a New York State Board of Heath approved dish machine or '3 compartment sink' hand-washing method. Items cleansed by the '3 compartment sink method' are scraped clean and pre-rinsed to remove any remaining food, then washed in hot water with dishwashing detergent. Items cleansed and sanitized in the dish machine are scraped clean, pre-rinsed and subjected to a chemical wash cycle at approximately 170° Fahrenheit and a final chemical rinse cycle at an approximate temperature of 180° to 190° Fahrenheit." (*Id.*, ¶8.)

"The Westchester County Department of Health conducts an annual inspection of Sing Sing's mess hall and dishwashing apparatus. Moreover Sing Sing maintains and updates temperature logs daily to indicate dishwater temperatures. Temperature logs annexed hereto as Exhibit A indicate that the dishwashing apparatus maintained proper temperatures pursuant to Department of Health guidelines." (*Id.*, ¶9.)

During the four months after October 2008, Simmons laboriously attempted to present evidence sufficient to create a triable issue of material fact. His Memorandum of Law signed March 6, 2009 (Doc #43), asserts at pages 15-16: "It has been admitted by the defendants that all equipment, pots, pans, and utensils are not thoroughly washed and sanitized (Declaration of Plaintiff, Affidavit in Opposition)." But no such "admission" is shown by that Declaration (Doc #41) or that Affidavit (Doc #40).

Simmons's Declaration (Doc #41) is dated 1/25/09 but was served with all of his opposition papers on 3/11/09. Its ¶88 says in part: "... Sing Sing mess hall possess[es] at least two dish machines, one in B-Mess Dining Room and one in 5-Building Dining Room. The temperature logs supplied by FSA Chu do not reflect this fact, which means that one or both machines could actually be operating at temperatures below the standard." However, Simmons's August 2008 Document Request No. 1 simply said: "Please provide temperature logs for Sing Sing Correctional Facility messhall for the 30 days prior to December 13, 2006 and the thirty days after." (Doc #49.) The natural conclusion is that Simmons requested and received the temperature logs for the messhall where Simmons was dining on December 13, 2006, as described in his grievance. His 2/1/07 appeal from that grievance was annexed to the Complaint, and it specified the "B-Block messhall."

The next paragraph in Simmons's Declaration (Doc #41) is ¶89, which says in part: "In response to the request for documents, FSA Chu submitted a list of over 52 different instances where dishes were dirty (Affidavit in Opposition - - Exhibit B). The plaintiff contends that these are the tip of the iceberg." His Affidavit in Opposition (Doc #40) is dated 12/22/08 but was served with all of his opposition papers on 3/11/09. Its ¶64 says:

> Mr. Chu alleges utensils are "thoroughly sanitized" (Declaration of Chu at 7). This is a key discrepancy on the facts of this matter and the origin of this claim. Dishes, utensils, pots, pans, trays, and spoons are routinely not properly clean. Every day there are dirty dishes set out for inmates to use (see ... Exhibit B).

But this allegation is not supported by Exhibit B to Doc #40. That exhibit is a chronological list of 52 Sing Sing inmate grievances that alleged dirty trays, utensils, cups, glasses, tables, or food. Of those 52 grievances, 45 were filed between 1/23/01 to 9/19/06, before plaintiff arrived at Sing Sing on October 31, 2006. Plaintiff was at Sing Sing from that date until on or about May 8, 2007 (Complaint, ¶1). During those six months and eight days, only 3 such grievances were filed. The remaining 4 such grievances were filed from 11/26/07 to 2/8/08.

As noted earlier, Simmons testified: "I never worked in the mess hall at Sing Sing so I don't know how they clean in Sing Sing." He offers mere speculation in his attempt to poke holes in Chu's Declaration. Moreover, his arguments are immaterial in

view of the following evidence about Islam's dietary requirements, which are not as strict as Simmons alleged in his Complaint.

    4.  <u>Doc #25 at Exh. C: The 7/25/08 and 8/20/08 Reports of Defense Expert Imam Feisal Abdul Rauf (provided to plaintiff on 8/29/08)</u>

The State of New York retained Imam Feisal Abdul Rauf (the "Imam") as an expert in Islam and Islamic law, and asked him to investigate the allegations in the case at bar and in *Majid v. Goord*, later recaptioned as *Majid v. Fischer*, 07 Civ. 4584(NRB). Since 1983, he has been the imam of Masjid al Farah (a Muslim congregation in New York City). He is the Founder and Chairman of the Cordoba Initiative (an independent, multi-national, multi-faith project that works with state and non-state actors to improve Muslim-West relations). (Doc #25, Exh. C, pp. 1-2, 9.)

The Imam reviewed the Complaint in the case at bar (signed by Simmons in Sing Sing on July 23, 2007) and the Amended Complaint in *Majid v. Goord* (signed by Majid in Green Haven and filed on July 31, 2007). The Imam also reviewed other documents submitted by Simmons, including a 2007 article entitled "The Meat is Ahlul-Kitaab ... Really?" (*Id.,* pp. 2-3.) (Simmons later re-submitted that article as the first 17 pages of Doc #51.)

The Imam issued two reports containing his expert opinions. His 7/25/08 report (Doc #25, Exh. C, pp. 1-12) analyzed the applicable Islamic dietary laws. His 8/20/08 supplemental report (*Id.,* pp. 13-16) reported on his tours of the food service operations at Green Haven and at Sing Sing, on August 4 and 5, 2008, respectively.

His 7/25/08 report includes the following:

    1) <u>Opinion Concerning Adequacy of RAM for Muslim Inmates:</u> The Religious Alternative Meal offered by DOCS is adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving.
            *   *   *
    Considering this theological background, it would seem contrary to the Qur'anic posture - - which alleviates the harsher, Jewish dietary requirements for the Muslims - - for Muslim inmates to request DOCS to adopt standards approximating kosher standards with respect to their meals and

meal preparation.  In fact, DOCS is not denying
a privilege to Muslim inmates while granting a
privilege to Jewish inmates (i.e., practicing
religious discrimination); rather, it is making
a reasonable effort to accommodate two different
religious dietary standards.  Because the kosher
standard is stricter, its [DOCS'] reasonable efforts
are different from those required for the halal
standard.

            *    *    *

     2) <u>Opinion concerning the use of utensils in
preparing, serving and eating the RAM;</u> ....

     ... Under Islamic law, there is no prohibition
against preparing, cooking, serving, or eating halal
food with utensils (pots, pans, dishes, cups, forks,
etc.) that have previously been used to prepare,
cook, serve, and eat non-halal foods (such as pork).

     However, there is a requirement that utensils
that have been in contact with non-halal foods be
*thoroughly* washed or cleaned.  Note that this
standard is less than "sterilized." ....

            *    *    *

     .... The general rule in Islamic law is
to follow *majra al ghalib* (the higher probability
or possibility).  After reviewing the voluminous
food service procedures, which include reporting
requirements and inspections, I conclude that it
is more probable that the utensils are thoroughly
cleaned than not, which satisfies the Islamic
legal requirement on the issue of utensils.

            *    *    *

     3) <u>Opinion concerning the contamination of
RAM dishes with pork dishes during meal service;</u>
So long as there is no intentional mixing of
pork dishes with non-pork dishes, the current
food service procedure is adequate and sufficient
under Islamic law.

     <u>Basis:</u> Islamic law does not elaborate on
precautions for preventing the contamination of
halal foods by non-halal foods.  What is required
by Islamic law is that halal food not be *mixed*
with haram food ....

            *    *    *

     .... Where there is unintentional contamination
through splashing or other instances where pork
dishes inadvertently com[m]ingle with the non-pork
dishes, Islamic law - - in the interest of avoiding
unnecessary hardship - - will overlook this.  ....

(Doc #25, Exh. C, pp. 4-8.)

The Imam toured the food service areas of Green Haven and of Sing Sing, on August 4 and 5, 2008, respectively. He then issued his 8/20/08 supplemental report, which includes the following:

     .... I was interested to learn that Mr. Chu lived in Pakistan for a number of years, which acquainted him with Islamic faith and practice.
          *    *    *
     .... [A]t Sing Sing, 60 percent of inmates (about 250) working in the mess hall are Muslim.
          *    *    *
     At Sing Sing, Imam Hasan A. Mu'min has been the Muslim chaplain for ten years. During his time as chaplain, he has never received any complaints related to Islamic dietary requirements.
          *    *    *
     At Sing Sing, I met with John Adrian Velasquez and Shakir Hussein of the Sing Sing ILC [Inmate Liaison Committee], who informed me that they received no complaints concerning violations of Islamic dietary requirements. They also informed me (which was confirmed by Mr. Chu) that one-third of ILC is comprised of Muslim inmates.
          *    *    *
     .... At all prisons, servers use different utensils and trays and other serving utensils for the RAM and non-RAM meals.
     As a further precaution, at both Sing Sing and Greenhaven, but not at Attica, a plastic screen is erected between the pork meal and the RAM meal.
     In addition to the above *method* of serving the RAM and non-RAM meals, at both Greenhaven and Sing Sing, a Muslim is on the line supervising the food service. ....
     At Sing Sing, Muslim inmate Abdul Aziz supervises the line, guaranteeing that delivery of all food is proper and in line with Islamic dietary requirements; he ensures that the pork dish is a safe distance away from RAM meals and that no cross contamination occurs.
          *    *    *
     The precautions taken by most of these prisons to ensure that there is no contamination between the RAM and regular meals - - separate serving utensils, designated servers, Muslim oversight on the service line, and plastic screen - - suggest that contamination of non-pork meals by pork meals is highly improbable.

*Cleaning Process:*
>       At all facilities, each food service item is
> first hand washed and sanitized followed by machine
> washed after every use.  Both processes use sanitizing
> chemicals and high temperatures.  By observation, it
> appears that every piece of cooking utensil goes
> through this process.  ....

(Doc #25, Exh. C, pp. 13-15.)

       Simmons has utterly failed to submit evidence to undermine
the Imam's opinions.  Instead, he gamely argues that the Imam
"determined the plaintiff's grievance had merit."  (Doc #43, Pl.
Memo of Law, p. 4.)  He simply cannot come to grips with the fact
that the Imam's expert opinions on Islamic dietary law show that
the defendants are entitled to summary judgment on all of his
claims.  At page 28 of his Memorandum of Law, Simmons summarizes
the Imam's opinions as follows:

>       .... Islamic dietary law strictly prohibits
> the mixing of halal and haram ([the Imam's report],
> p. 1).  When this is done unintentionally and there
> is doubt, there is no sin on the Muslim who consumes
> it (id at 7).  However, **when** this is done frequently
> and blatantly, leaving no doubt, **then** it is imper-
> missible for Muslims to eat [the] RAM (id at 8).

(Doc #43, p. 28, with my emphasis added.)  But of course the Imam
did not find any mixing of halal and haram.  He toured the food
service areas of Green Haven and Sing Sing and reported that
"contamination of non-pork meals by pork meals is highly
improbable."  (Doc #25, Exh. C, p. 15.)

       At page 18 of his Memorandum of Law, Simmons asserts: "After
visiting Sing Sing and Green Haven, the Imam proposed solutions
similar to those sought in the grievance."  This is a gross
exaggeration.  The Imam's 8/20/08 supplemental report praised the
practices already undertaken at Sing Sing and Green Haven.  The
Imam merely recommended that DOCS draft new written policies to
"[i]nstitutionalize the practices already undertaken," and also
recommended that DOCS "[c]onduct food service trainings based on
those policies."  (Doc #25, Exh. C, p. 16.)  DOCS promptly
followed those two recommendations by issuing a memorandum dated
October 10, 2008 to all facility administrators, reminding them
of RAM preparation and service policies and implementing new
training requirements regarding RAM service for all DOCS' food
service employees.  (Doc #22, Culkin Decl., ¶14 and Exh. A.)  It
is true that the Imam also recommended: "Offer the option of

Muslim inmates partaking in the kosher meals and/or the inclusion of more halal meals than the current 57 per year." (Doc #25, Exh. C, p. 16.) But the Imam did not dispute that this would be expensive, and he had already explained that Muslim dietary requirements are less strict than kosher requirements. (*Id.*, p. 5.)

At page 31 of his Memorandum of Law, Simmons says: "The plaintiff has offered three solutions, none of which would infringe negatively on cost or administration." I note that he no longer argues, as his grievance did, that DOCS should "use disposable forks and plates when pork is served." Apparently he realizes that this would be more expensive than using the reusable forks and plates that go through a dishwasher. His three current solutions are: "1. Incorporate a halal menu," or "2. Modify the RAM to include hermetically sealed alternatives," or "3. Develop RAM as a Kosher vegetarian meal." (Doc 43, pp. 31-32.) All three of plaintiff's proposals would require DOCS to incur more expense. In view of the Imam's reports, there is no legal basis to require DOCS to adopt any of plaintiff's proposals.

5. Judge Buchwald's 7/31/09 Decision

In the *Majid* case, on July 31, 2009, Judge Buchwald granted summary judgment to the lone defendant (the Commissioner of DOCS) on a record that was essentially identical to the record in the case at bar. *Majid v. Fischer*, 07 Civ. 4585 (NRB), 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. July 31, 2009). As I noted earlier, Judge Buchwald was focusing on Green Haven. By coincidence, Simmons has been housed at Green Haven since February 2009. The *Majid* plaintiffs filed a notice of appeal, and the Clerk's Office sent the record to the Court of Appeals on October 26, 2009, but the Court of Appeals has not yet assigned a Docket Number to the appeal.

I recommend that Judge Batts adopt the reasoning of Judge Buchwald, whose decision included the following (with footnotes omitted):

**a. Standard of Review**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law, Fed. R. Civ. P. 56(c), i.e., where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party." *Lovejoy-Wilson v. NOCO Motor Fuel Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (internal citation and quotation marks omitted). However, "[c]onclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of material fact." *Shannon v. New York City Transit Authority*, 332 F.3d 95, 99 (2d Cir. 2003) (internal citation and quotation marks omitted). We construe the submissions of *pro se* litigants liberally and interpret them to raise the strongest arguments that they suggest. *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

\*    \*    \*

**1. The First Amendment**

Plaintiffs allege that defendant violated their First Amendment rights by restricting them to the RAM diet, which they claim is neither nutritionally adequate nor in conformity with halal requirements.

In order to make a claim under the First Amendment, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). However, even if he makes such a showing, "the [Supreme] Court [has] held that a challenged prison regulation is judged 'under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests.'" *Id*. at 274 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987) (internal quotation marks omitted)).

To determine whether a prison regulation is reasonably related to legitimate penological interests, we evaluate four factors:

[1] whether there is a rational relationship between the regulation and the legitimate government interests asserted; [2] whether the inmates have alternative means to exercise the right; [3] the impact that accommodation of the right will have on the prison system; and [4] whether ready alternatives exist which accommodate

the right and satisfy the governmental interest.

*Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)
(citing *Turner v. Safley*, 482 U.S. 78, 89-91, 107 S.Ct.
2254, 96 L.Ed.2d 64 (1987)).  The first of these
factors is "more properly labeled an 'element' because
it is not simply a consideration to be weighed but
rather an essential requirement." *Salahuddin*,
467 F.3d at 274.  In conducting the *Turner* analysis,
we accord "wide-ranging deference" to the decisions
of prison administrators because "the realities of
running a penal institution are complex and difficult,
. . . [and c]ourts are ill equipped to deal with the
increasingly urgent problems of prison administration
and reform."  *Jones v. North Carolina Prisoner's
Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532,
53 L.Ed.2d 629 (1977) (internal citations and
quotation marks omitted).

     In the present case, the RAM program places at
most a minimal burden on plaintiffs' free exercise of
religion, given that the RAM diet has been found to be
consistent with Islamic dietary requirements.  *See,
e.g., Abdul-Malik v. Goord*, 96 Civ. 1021 (DLC),
1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6
(S.D.N.Y. Feb. 27, 1997) ("The RAM diet is sufficient
to sustain prisoners in good health and its consumption
does not require any violation of the tenets of Islam.").
In any event, even if we assume that the burden prong
of the free exercise claim is met, we reject plaintiffs'
First Amendment claim because DOCS' dietary policies
easily pass muster under the *Turner* four-part test.

     With regard to the first *Turner* factor, it is
well established that DOCS has a legitimate interest
in cost-effectively meeting the religious dietary needs
of multiple inmate groups, and that the RAM program,
which was "designed to accommodate the needs of inmates
who may have different dietary requirements due to their
religious beliefs or personal dietary beliefs . . .
in an economically viable way" (Culkin Decl. ¶¶ 5-6),
is rationally related to that interest.  *See
Abdul-Malik*, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402,
at *8 (finding that DOCS' "adoption of the largely
meatless RAM menu as a means of addressing the
religious dietary requirements of a number of different
religious groups" satisfied the first factor of the
*Turner* test).

The second *Turner* factor also supports defendant's position.  Plaintiffs themselves admit that they have the option to, and in fact do, supplement their diet with halal food items purchased at Green Haven's commissary or received in care packages.  (Majid Dep. 90:24; Cham Dep. 50:16-22, 51:4-9.)

With regard to the third *Turner* factor, it is clear that providing a separate halal meal program for Green Haven's Muslim inmates would significantly burden prison resources and staff.  DOCS formulated the RAM program in order to accommodate the needs of as many inmate groups as possible in a cost-effective way (Culkin Decl. ¶¶ 5-6), and each religion that is removed from under the RAM program and individually accommodated imposes serious economic and administrative burdens on DOCS.  The CAD, for example, which exclusively accommodates those Jewish inmates whose religion forbids them from partaking of RAM, costs $5.42 per meal -- significantly more than the $2.61 DOCS spends for each regular meal and the $2.60 it spends for a RAM meal. (Culkin Decl. ¶ 10 n.1.) As the religious dietary needs of Muslims, however, can be accommodated through the RAM program, there is no similar justification for imposing upon DOCS the burden and expense of a separate halal meal program.

Requiring DOCS to provide more halal meat as part of its RAM program would similarly burden DOCS' resources.  According to defendant, a halal chicken patty costs more than twice as much as a non-halal patty.  (Further Culkin Decl. ¶ 3.)  If DOCS were to offer a halal chicken patty just one more time per week across the DOCS system, it would cost DOCS between $133,256 per year (if consumption were limited to DOCS' Muslim inmates) and  $401,448.51 per year (if the patties were offered to the general inmate population, which is currently allowed to consume RAM meals).  (*Id.*)

Finally, with regard to the fourth *Turner* factor, plaintiffs do not suggest another way to accommodate their requests for a separate halal diet that does not implicate the legitimate penological interests discussed above.

In sum, because it is not our role to substitute our judgment for that of the DOCS' officials who have

made reasonable efforts to accommodate the practices of all its inmates, we find that accommodating the plaintiffs' dietary requirements through the RAM program is "reasonable" under the *Turner* four-part test. We therefore grant summary judgment to defendant on plaintiffs' First Amendment claim challenging Green Haven's dietary policy.

## 2. RLUIPA

[NOTE: "RLUIPA" is an abbreviation for the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§2000cc *et seq*. Simmons's Complaint did not specifically identify RLUIPA as a legal predicate for his §1983 claims. However, the defendants discussed RLUIPA in their briefs (Doc #20 at pp. 20-21; Doc #56 at pp. 9-10). Judge Sullivan has ruled that monetary damages are unavailable under RLUIPA. *Pugh v. Goord*, 571 F.Supp.2d 477, 506-09 (S.D.N.Y. 2008).]

Plaintiffs also bring their dietary claims under RLUIPA, alleging that DOCS' provision of the RAM diet substantially burdened their free exercise of Islam.

Section 2000cc-1(a) of RLUIPA protects inmates by providing that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person − −
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Under RLUIPA, "[o]nly if a plaintiff shows that his religious exercise has been 'substantially' burdened[] do the defendants need to show something more than a rational relationship between the policy at issue and a governmental interest." *Graham*, 2008 U.S. Dist. LEXIS 33954,

2008 WL 1849167, at *13. A "substantial burden" exists "when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citing *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

Applying this framework to the present case, we determine that plaintiffs' dietary claims under RLUIPA must fail because plaintiffs have not demonstrated that their exercise of religion is substantially burdened by DOCS' provision of the RAM meal program in place of an exclusively halal diet.

Although the Second Circuit has held that inmates have a constitutional right to a diet consistent with their religious scruples, *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003), "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the 'provision of a diet sufficient to sustain the prisoner in good health without violating [his religion's] dietary laws.'" *Abdul-Malik*, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (quoting *Kahane v. Carlson*, 527 F.2d 492, 496 (2d Cir. 1975)) (assessing the constitutionality of Green Haven's menu planning under the Religious Freedom Restoration Act ("RFRA"), the predecessor to RLUIPA). In *Abdul-Malik*, this Court [Judge Cote] specifically found that "[Green Haven's] RAM diet is sufficient to sustain prisoners in good health and its consumption does not require any violation of the tenets of Islam," 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6, and we have no reason, on the facts alleged here, to conclude otherwise.

\*    \*    \*

Defendant has also offered abundant evidence indicating that service of RAM and the cleaning procedures in place at Green Haven conform to Islamic dietary law. Defendant's expert testified that "it is more probable that the utensils are thoroughly cleaned than not, which satisfies the

Islamic legal requirement" (Def.'s Mem., Ex. E at 7),
....  Further, 40 of the 175 food service personnel
in Green Haven's mess hall are Muslim inmates
(Johnston Decl. ¶ 3), such that Green Haven's
Muslim inmates are themselves in a position to
ensure that the prison's cleaning and serving
procedures conform to Islamic requirements.  [NOTE:
The Imam's supplemental report states that "at
Sing Sing, 60 percent of inmates (about 250)
working in the mess hall are Muslim."  (Doc #25,
Exh. C, p. 14.]

     Plaintiffs' non-expert assertions are
insufficient to overcome the universal holdings
that DOCS' RAM program withstands constitutional
scrutiny.  Moreover, it should be noted that DOCS
has made efforts to accommodate through a common
denominator the religious dietary needs of multiple
prison groups.  Because we find that plaintiffs
have not shown that DOCS imposed a substantial burden
on their free exercise, we do not reach the issue of
whether DOCS has demonstrated a compelling interest
to justify its menu planning.  Accordingly, we grant
summary judgment for defendant on plaintiffs' dietary
claim under RLUIPA.

### 3. The Fourteenth Amendment

     Finally, plaintiffs allege that defendant
violated their equal protection rights by failing
to provide them with a halal diet equivalent to the
kosher diet that Jewish inmates at Green Haven receive.

     In order to make a claim under the Equal
Protection Clause, a claimant "must demonstrate that
he was treated differently than others similarly
situated as a result of intentional or purposeful
discrimination."  *Phillips v. Girdich*, 408 F.3d 124,
129 (2d Cir. 2005).  Further, "[h]e . . . must show
that the disparity in treatment cannot survive the
appropriate level of scrutiny which, in the prison
setting, means that he must demonstrate that his
treatment was not 'reasonably related to [any]
legitimate penological interests.'"  *Id*. (quoting
*Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475,
149 L.Ed.2d 420 (2001)).  As is true in the First
Amendment context, the reasonableness of prison
regulations drawing distinctions among inmate groups

is determined by application of the *Turner* four-part test, discussed above. *Benjamin*, 905 F.2d at 575.

Applying these principles to plaintiffs' dietary claims under the Fourteenth Amendment, we determine that, even if plaintiffs had established "intentional or purposeful discrimination" by DOCS, their equal protection claim must fail because DOCS' adoption of the RAM menu to accommodate their religious dietary requirements easily survives scrutiny under the *Turner* four-part test.

With regard to the first *Turner* factor, DOCS has asserted several reasons for providing Jewish prisoners with the CAD program, while denying Muslim inmates a halal equivalent. The first of these is economic. DOCS statistics indicate that (as of January 1, 2008) 351 Green Haven inmates are Muslim (16.7%), whereas only 81 (3.8%) identify as Jewish. (The Hub System Profile of Inmate Population Under Custody on January 1, 2008, http://www.docs.state.ny.us/Research/Reports/2008/ Hub_Report_2008.pdf (last visited Jul. 28, 2009).) Because Jewish inmates cannot partake of the RAM program (Def.'s Mem. at 22), DOCS has decided to separate out the small group of Jewish prisoners and accommodate all other groups with similar requirements together, rather than to restructure the RAM program to accommodate all inmates, which would significantly increase the per-meal cost of RAM and would render the RAM diet less appealing to all prisoners as the additional kosher restrictions were put into place.

In addition to the economic rationale for limiting the CAD to Jewish prisoners, defendant asserts that it restricts the program to Jewish inmates in order to 'minimize the administrative burden in preparing kosher meals due to the special handling and preparation requirements of food required by the tenets of Judaism." (Culkin Decl. ¶ 11.) Indeed, opening up the CAD to the 351 Muslim inmates at Green Haven or requiring DOCS to provide Muslims with separate halal meals would entail a substantial investment in resources and time. These justifications reflect legitimate governmental interests, which are rationally related to the decision to provide Jewish inmates with the CAD

program, and to structure the RAM program so as to meet the dietary requirements of multiple inmate groups including Muslim inmates.

Turning to the second *Turner* factor, as described above, there are several alternatives through which Muslim inmates at Green Haven may supplement the RAM diet with additional halal items. Plaintiffs themselves admit that they have the option to, and in fact do, supplement their diet with halal food items purchased at Green Haven's commissary or received in care packages. (Majid Dep. 90:24; Cham Dep. 50:16-22, 51:4-9.)

With regard to the third *Turner* factor, accommodating the 351 Muslim inmates at Green Haven by providing them with a separate halal meal program or by opening up the CAD program -- which costs DOCS approximately $5.42 per meal (Culkin Decl. ¶¶ 10 n.1, 11) and requires separate handling and packaging -- to Muslim inmates would significantly burden DOCS' staff and resources.

Finally, with regard to the fourth *Turner* factor, plaintiffs have not suggested an alternative way for DOCS to structure its meal programs that does not implicate the legitimate penological interests discussed above. Denying Jewish inmates the CAD program would violate their constitutional right to a diet consistent with their religious beliefs, and including Muslims in the CAD or providing them with a separate meal program would impose significant administrative and economic burdens on DOCS. DOCS has also stated that, although it has been exploring the possibility of providing more halal meat through the RAM program, it has had "limited success in finding vendors/suppliers who can meet our quantity requirements in a cost effective manner." (Culkin Decl. ¶ 13.)

Given the legitimate penological interests that inform DOCS' meal program policies, we grant summary judgment in favor of defendant on plaintiffs' equal protection claim regarding DOCS' dietary policies.

*Majid v. Fischer*, 07 Civ. 4585 (NRB), 2009 U.S. Dist. LEXIS 71616, at *14-30 (S.D.N.Y. July 31, 2009).

## CONCLUSION AND RECOMMENDATION

For all the reasons stated above, I recommend that Judge Batts grant the defendants' motion for summary judgment.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 14 calendar days after being served with a copy **(i.e., no later than February 18, 2010)**, by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, and (b) to the Hon. Deborah A. Batts, U.S.D.J. at Room 2510, 500 Pearl Street, New York, NY 10007. Failure to file objections within 14 calendar days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to the District Judge, Judge Batts.

*[signature]*

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007

Dated:     New York, New York
           January 28, 2010

Copies of this Report and Recommendation are being mailed to:

Alphonso Simmons
06-A-5276
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Wesley E. Bauman, Esq.
Assistant Attorney General
State of New York
120 Broadway
New York, NY 10271

Pro Se Office
U.S. Courthouse, Room 230
500 Pearl Street
New York, NY 10007

Hon. Deborah A. Batts
U.S. District Judge
U.S. Courthouse, Room 2510
500 Pearl Street
New York, NY 10007